OPINION OF THE COURT
Michael L. Pesce, J.
Defendants independently move pro se for orders pursuant *150 to CPL 420.35, vacating the mandatory surcharges imposed upon them at the time of sentencing. Each defendant claims that due to his incarceration, he cannot earn enough money to satisfy this obligation. Further, all three urge that forcing them to pay the surcharge would create an undue hardship on them and their families.
The first defendant, Victor Olivo, pleaded guilty on October 4, 1991 to grand larceny in the fourth degree, and was sentenced on October 29, 1991 to an agreed upon term of two to four years’ incarceration. He was also ordered to pay a $150 mandatory surcharge (Penal Law § 60.35).
The second defendant, Shondu Allah, pleaded guilty on March 5, 1992 to robbery in the first degree. He was sentenced on March 26, 1992 to a term of 3Vi to 10 Vi years. A surcharge of $150 was imposed, along with a $5 crime victims’ assistance fee. It should be noted that Mr. Allah also owes $150 assessed on a Queens case.
The third defendant, Miguel Velez, pleaded guilty to criminal sale of a controlled substance in the second degree on January 13, 1992. On April 7, 1992, he was sentenced to a term of 10 years to life. He, too, was ordered to pay a $150 surcharge plus a $5 crime victims’ assistance fee.
By creating a mandatory surcharge for persons convicted of felonies, misdemeanors and violations, the Legislature wished to divert the expense of providing services to victims of crimes toward those who committed the crimes, rather than burden law-abiding taxpayers with such costs. (1983 McKinney’s Session Laws of NY, at 2356.) In 1983 the Legislature estimated that such assessments would save taxpayers $7.7 million during the fiscal year. (1983 McKinney’s Session Laws of NY, at 2358.) CPL 420.35 provides a waiver for those defendants who, due to indigence, cannot afford to pay the mandatory fee. The statute, in pertinent part, reads: "where a person is guilty of any offense for which a mandatory surcharge shall be imposed * * * the judge or hearing officer may waive all or any part of the mandatory surcharge where, because of indigence of the offender, the payment of said surcharge would work an unreasonable hardship on the person convicted or his or her immediate family.” (CPL 420.35 [2].)
It is common knowledge that many inmates participate in work programs with the State Department of Correctional Services. The State provides an "incentive allowance” to those inmates who willingly and efficiently perform the duties as *151 signed to them. (Correction Law § 200 [1].) Often an inmate is assigned to an educational, vocational, or industrial training program which is used to help reintegrate the individual back into society. An "incentive allowance” may be allotted under these circumstances as well. (Correction Law § 200 [2].)
Pursuant to section 200, the Commissioner of Correctional Services has established a graduated schedule of payment for inmates who participate in such work or vocational programs. Wages are based upon the type of job to which the inmate is assigned, as well as the amount of time the inmate has been working. If the inmate has been working for a substantial amount of time, he may be eligible for added payment on top of his existing salary. Generally, the higher paying jobs are administrative, while the chores that require less responsibility pay less.
For example, under the wage schedule established by the Commissioner of Correctional Services, a "Grade 5” inmate enjoys the highest level of gradation, and is paid either by the day or the hour. If paid by the day, the "Grade 5” inmate earns an allowance of $2 per day; if paid by the hour, the inmate earns 65 cents per hour. A "Grade 4” inmate paid by the day earns a daily allowance of either $1.45 or $1.55, depending on the specific job the inmate performs. A "Grade 4” inmate, if paid by the hour, may earn either 38 cents or 42 cents per hour, depending upon the type of job being performed. Further, a "Grade 4” inmate may qualify to make 45 cents per hour after satisfactorily performing "Grade 4” duties for several years.
An idle[1] inmate is paid nothing. However, if an inmate has requested placement in a work or educational program, he is paid 45 cents each day he remains unassigned. One can imagine the situation where an inmate has requested assignment and, due to administrative delay, sits idly, waiting to be placed. Oddly enough, under these circumstances the inmate does nothing and gets paid for doing so.
Moreover, according to the payroll standards established by the State, an inmate may even get paid for days when he misses work due to court appearances. (Dept of Correctional Servs Directive No. 4802, at 3.) The same cannot be said for *152 the victims of crimes who often must take a leave of absence from their busy work schedules to testify in court. However, inmate privileges do not end there. An inmate receives time and one half for working during an "Institution Holiday”, and is not penalized in pay for missing work while visiting with his family or legal advisors, or while engaged in approved religious services. (Dept of Correctional Servs Directive No. 3802, at 4.)
The salary earned by an inmate is held in a fund by the superintendent or municipal official of the correctional facility until such time as the inmate is released (Correction Law § 125). Also added to the inmate’s fund are moneys in the possession of the inmate at the time of his admission into the correctional facility, and other moneys received by the inmate or on his behalf while incarcerated (Penal Law § 60.35 [5]).
If a mandatory surcharge and/or crime victim assistance fee has been imposed upon an inmate, collection of the surcharge begins at the "reception/classification facility and * * * [continues] at any subsequent facility until payment can be made.” (Dept of Correctional Servs Directive No. 2788, at 2.) Twenty percent of an inmate’s weekly earnings and 50% of any earnings received from any outside source may be retained to cover the cost of the mandatory surcharge. (Dept of Correctional Servs Directive No. 2788, at 2.)
The daily earnings by an inmate may often be nominal; however, given the length of time that a defendant may serve, these amounts can often add up to large sums of money. Thus a prisoner may claim indigency at the beginning of his sentence, only to exit prison numerous years later with several hundred, if not thousands, of dollars. In anticipation of such a situation, case law clearly states that an application for the vacatur of the mandatory surcharge is properly made at the end of the defendant’s incarceration. (See, People v Snell, 161 AD2d 1125; People v Conigliaro, 144 AD2d 685; People v Fulton, 138 AD2d 514.)
Thus, the defendants’ motions may be dismissed as premature, for they still have, at a minimum, anywhere from one to nine years left to serve on their respective sentences. However, due to the number of motions of this sort that are served upon the court throughout the year, it behooves this court to delve further into the indigency issue under Penal Law § 60.35. It is imperative that certain guidelines be established to determine when a defendant is truly indigent so as to avoid abuse of the court’s power of vacatur in the future.
*153 Incarceration, standing alone, cannot support a prima facie case of indigency. Summarily waiving the surcharge imposed by law simply because an individual is incarcerated runs contrary to the revenue-raising intent of Penal Law § 60.35 and CPL 420.35. Indeed it is clear from the directive issued by the State Department of Correctional Services that inmates have earning potential; so much so that special procedures have been established by the State to garnish an inmate’s prison work wages and/or any other sources of income that an inmate may receive. (See, Dept of Correctional Servs Directive No. 2788, at 2 ["Mandatory Surcharge/Crime Victim Assistance Fee — Special Procedures”].)
In the instant case, for example, defendant Olivo is incarcerated at the Livingston Correctional Facility. While there, he works for an alcohol and substance abuse program in the morning, and participates in an engine repair class in the afternoon. For these activities, the defendant earns a total of $1 each day, five days a week. If Mr. Olivo continues with his current work schedule, by the earliest date on which he may be released he will have earned a total of $260. Even assuming that the defendant will use some of his money for necessities, and further assuming that he will receive no moneys from any other source, it would be erroneous to conclude that the defendant will not be able to satisfy at least some of the surcharge. At the very least, Mr. Olivo will be able to satisfy $52 of the surcharge (20% of his $260 prison wages) during his incarceration.
Miguel Velez works in the correctional facility mess hall. As a "Grade 1” inmate, he earns 16 cents per hour for a 40-hour week. At the end of a year, this totals $332.80, a sum more than double the amount of the surcharge. Mr. Velez is facing a minimum of 10 years on his term. If he continues with the same schedule at the same rate of compensation, he will earn over $3,000. Again, this court cannot reasonably conclude that he will be unable to satisfy any part of his debt.[2]
Admittedly, after these defendants pay the surcharges they owe and use their earnings to buy necessities in jail, they may not have much left over. However, upon being discharged or released from a correctional facility, each inmate receives "suitable clothing adapted to the season in which he is discharged * * * forty dollars in money, and transportation to the county of his conviction or to such other place as the *154 commissioner of correctional services may designate.” (Correction Law § 125 [2].) It is not the function of the correctional system to allow an inmate to build a bank account at the expense of law-abiding taxpayers. Rather, the amount earned by a prisoner during his sentence is properly directed toward paying costs incurred by the judicial system in the prosecution and, in many cases, the defense of the inmate, as well as those necessities supplied to the inmate during his course of stay at the facility.
The defendants’ motions are therefore denied.

. "Idle” is defined by the Department of Correctional Services as "[a]n inmate able to work, but not available due to disciplinary confinement or to his or her unwillingness to work”. (See, Dept of Correctional Servs Directive No. 4802, at 1 ["Definitions”].)

. Information as to Mr. Allah’s activities was unavailable.